NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12571

COMMONWEALTH  vs.  BRANDYN LEPAGE.


Bristol.     January 8, 2024. - May 17, 2024.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.


Homicide.  Felony-Murder Rule.  Robbery.  Firearms.  Cellular Telephone.  Practice, Criminal, Disclosure of evidence, Assistance of counsel, Motion to suppress, New trial, Capital case.  Search and Seizure, Expectation of privacy.  Constitutional Law, Search and seizure, Privacy, Right to obtain evidence, Assistance of counsel.  Due Process of Law, Disclosure of evidence.  Evidence, Exculpatory, Disclosure of evidence.  Privacy.



Indictments found and returned in the Superior Court Department on December 20, 2012.

Pretrial motions to suppress evidence were heard by Renee P. Dupuis, J.; the cases were tried before Robert J. Kane, J.; and a motion for a new trial, filed on February 10, 2020, was heard by Dupuis, J.


Chauncey Wood (Rachel Chunnha also present) for the defendant.
Julianne Campbell, Assistant District Attorney, for the Commonwealth.

GEORGES, J.  On September 29, 2012, the defendant, Brandyn Lepage, shot and killed Aja Pascual in her car.  After a jury trial, the defendant was convicted of murder in the first degree on the theory of felony-murder.[1]  Before us is the defendant's consolidated appeal from his conviction and from the denial of his motion for a new trial, in which the defendant principally challenges the denials of his two pretrial motions to suppress certain cell phone records and other evidence related thereto.  The defendant raises several arguments centered around the theory the police illegally obtained call detail records[2] from his cell phone, as well as historical cell site location

---

[1] The jury also convicted the defendant of unlawful possession of a firearm, G. L. c. 269, § 10 (a), and armed robbery, G. L. c. 265, § 17; the trial judge dismissed the armed robbery conviction under the merger doctrine.

[2] "Call detail records" consist of time-stamped logs of "[1] the telephone numbers from which the cellular telephone received incoming calls [and text messages] and [2] the telephone numbers to which outgoing calls were made [and text messages sent] from the cellular telephone."  Commonwealth v. Collins, 470 Mass. 255, 269 (2014).  Any reference to "call detail records" within this opinion is not to be construed as including any cell site location information (CSLI) that may appear in such records.

information (CSLI)[3] and ping data,[4] and then used this information to develop the case against him.

We conclude the police did not illegally obtain the defendant's call detail records, and we adopt the motion judge's findings that the police did not use the CSLI or ping data in the manner the defendant alleges. Additionally, after plenary review of the record, we find no basis to exercise our extraordinary powers under G. L. c. 278, § 33E, to reduce the verdict or grant a new trial. Therefore, we affirm the defendant's conviction of murder in the first degree and likewise affirm the denial of his motion for a new trial.[5]

---

[3] CSLI "refers to a cellular telephone service record or records that contain information identifying the base station towers and sectors that receive transmissions from a [cellular] telephone. Historical CSLI refers to CSLI relating to and generated by cellular telephone use that has already occurred at the time of the order authorizing the disclosure of such data" (quotations and citations omitted). Commonwealth v. Augustine, 467 Mass. 230, 231 n.1 (2014), S.C., 470 Mass. 837 and 472 Mass. 448 (2015).

[4] "On request, a cellular service provider (service provider) can cause a cell phone to transmit its global positioning system (GPS) coordinates to the provider, in a process known as 'pinging.'" Commonwealth v. Almonor, 482 Mass. 35, 36 n.1 (2019).

[5] The defendant was convicted of unlawful possession of a firearm, G. L. c. 269, § 10 (a), without the benefit of requiring the Commonwealth to prove beyond a reasonable doubt he lacked a firearm license. See Commonwealth v. Guardado, 491 Mass. 666, 690, S.C., 493 Mass. 1 (2023). Accordingly, we vacate that conviction and remand for a new trial as to that indictment. See Guardado, 493 Mass. at 12.

1.  Background.  a.  Facts.  We summarize the facts the jury could have found, reserving certain facts for later discussion.  On September 29, 2012, at around 1:23 P.M., Fall River police officers were dispatched to Cherry Street, a residential road in Fall River, where they found the victim, who had been shot and killed in her parked car.  The victim's pants pockets had been turned inside out and a package containing cocaine was discovered beneath her body.  Another package of cocaine was later found inside the victim's bra.

Although the victim had been in possession of her cell phone shortly before her death, the cell phone was not found at the scene.  The police obtained call logs listing incoming calls to and outgoing calls from the victim's cell phone around the time of the shooting.  One of the phone numbers listed in the call logs belonged to the defendant.  The call logs indicated that, on the day of the shooting, the defendant called the victim's cell phone at 12:50 P.M. and the victim returned the call shortly after 1 P.M. -- less than half an hour before the police were dispatched to the scene of the shooting.

In September 2012, the defendant was living in Fall River with his friend, Thomas Brabant, one street over from where the victim was murdered.  At that time, the defendant was in a dating relationship with Jared Skomiro, who lived in an apartment -- also in Fall River -- belonging to Skomiro's

friend, Ashley Richard.  The defendant often stayed at Richard's apartment with Skomiro.

On the evening of September 28, 2012, the defendant spent the night at Richard's apartment.  The next morning -- the day of the shooting -- the defendant left the apartment after making a phone call.  Later that day, at approximately 1:28 P.M., Skomiro received a phone call from the defendant.  The defendant told Skomiro he wanted to be picked up, and he did not want to talk about what had occurred.  According to Skomiro, the defendant sounded "weird" during the call.

Skomiro and another individual subsequently drove to the defendant's location, which was near the scene of the shooting. Once in the car, the defendant told the group that "he got into a fight with a guy," and that he "ran his pockets," which Skomiro understood to mean the defendant had robbed someone. The defendant also showed Skomiro a pill bottle containing what appeared to be "crack" cocaine.  At the defendant's request, the group drove by the scene of the shooting, where they saw police tape and investigators.  Leaving the crime scene, the group went to Richard's residence.  Later that evening, after watching a television news broadcast about the murder, the defendant told Skomiro he knew the person who had been killed and was supposed to meet up with her that day.

During their investigative efforts, the police secured a warrant to search Richard's apartment, where they seized a handgun, a bloodstained T-shirt, bloodstained shorts, and a pill bottle on which the defendant's fingerprints were found. Deoxyribonucleic acid (DNA) profiles were recovered from the handgun, the T-shirt, and the shorts. The DNA profile from the handgun matched the defendant's DNA profile, while the DNA profiles from the T-shirt and shorts matched the victim's and the defendant's DNA profiles.

b. <u>Procedural history</u>. On December 20, 2012, the defendant was indicted by a Bristol County grand jury on one count of murder in the first degree, in violation of G. L. c. 265, § 1; one count of armed robbery, in violation of G. L. c. 265, § 17; and one count of unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (a).

Prior to trial, the defendant filed several motions to suppress. Relevant to this appeal, the defendant filed two motions to suppress cell phone records -- obtained by the police without a warrant from the defendant's cellular service provider, T-Mobile -- and evidence derived from these records.[6] First, in December 2014, the defendant filed a motion to suppress "evidence of call logs, phone calls, [text messages],

---

[6] How these records were obtained by the police is further discussed infra.

[multimedia messages], data sent and receive[d], and all historical records of [CSLI] obtained from the defendant's cellular telephone and/or cellular provider without a warrant." Second, in June of 2015, the defendant filed a motion to suppress "all evidence and information derived directly or indirectly from the T-Mobile records" under the "fruits of the poisonous tree" doctrine. After holding a three-day evidentiary hearing on the defendant's motions to suppress, a Superior Court judge (motion judge) denied both motions in April of 2016.

The defendant's jury trial commenced on June 13, 2016, before a different Superior Court judge (trial judge). The Commonwealth proceeded on all three theories of murder in the first degree. On the ninth day of trial, the jury found the defendant guilty of murder in the first degree based on the theory of felony-murder, with armed robbery as the predicate felony. The defendant filed a timely notice of appeal.

On February 10, 2020, the defendant moved for a new trial, which we remitted to the Superior Court. After a four-day evidentiary hearing, on July 6, 2022, the same motion judge who had previously denied the defendant's motions to suppress likewise denied the defendant's motion for a new trial. We subsequently consolidated the defendant's direct appeal with his appeal from the denial of his motion for a new trial.

2.  Discussion.  The defendant argues the motion judge erred in denying his motions to suppress and his motion for a new trial because the police illegally obtained his call detail records, CSLI, and ping data in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.  Moreover, the defendant alleges the police used this information during their investigation to identify witnesses, obtain search warrants, and surveil the defendant prior to his arrest.  The defendant further contends the police and prosecutors purposefully concealed from the defendant the fact they obtained and used this information during their investigation.

"When considering a defendant's direct appeal from a conviction of murder in the first degree along with an appeal from the denial of a motion for a new trial, we review the entire case pursuant to G. L. c. 278, § 33E."  Commonwealth v. Wilson, 486 Mass. 328, 333 (2020).  There is substantial overlap in the issues raised by the defendant in his motions to suppress and his motion for a new trial.  For the sake of clarity, we analyze them separately -- starting with the defendant's motions to suppress.

a.  Motions to suppress.  In his motions to suppress, and on appeal, the defendant argues the police violated his

constitutional rights against unreasonable searches and seizures when they obtained his call detail records without a warrant.[7] Moreover, the defendant asserts the fruits of this unlawful search should have been suppressed -- including statements made by several witnesses the police contacted using the defendant's call detail records, as well as physical evidence seized pursuant to search warrants predicated on the statements of these witnesses.

In support of his argument that a warrant is required for call detail records, the defendant contends the Federal Stored Communications Act (SCA), 18 U.S.C. §§ 2701 et seq., creates a reasonable expectation of privacy in call detail records because it limits the circumstances when these records can be disclosed by cellular service providers. The defendant further contends that even if he did not have a reasonable expectation of privacy in his call detail records, suppression is still the proper remedy because the police violated the SCA when they allegedly fabricated exigent circumstances in order to obtain the call detail records.

---

[7] The defendant also argues the search of his call detail records was neither justified by exigent circumstances nor supported by probable cause. We need not reach this argument because, as explained infra, the defendant lacked a reasonable expectation of privacy in his call detail records and therefore a warrant was not required to obtain this information. See Almonor, 482 Mass. at 40.

i.  Motion judge's factual findings.  When reviewing the denial of a motion to suppress, "[w]e accept the motion judge's findings of fact unless they are clearly erroneous" (citation omitted).  Commonwealth v. Henley, 488 Mass. 95, 100 (2021).  We also "defer to the judge's determination of the weight and credibility to be given oral testimony presented at the motion hearing" (quotation and citation omitted).  Commonwealth v. Miranda, 484 Mass. 799, 835, cert. denied, 141 S. Ct. 683 (2020).  Here, the motion judge made the following relevant findings of fact based on the evidence presented during the evidentiary hearing, which are not clearly erroneous, and which we supplement based only on the undisputed evidence in the record.  See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

Detective Lawrence Ferreira of the Fall River police department oversaw the investigation of the victim's death, which spanned several days.  Other Fall River police officers assisted with the investigation, including Detective Steven Washington, Detective John McDonald, and Detective Raul Camara.  Additionally, members of the State police aided in the investigation, including Trooper Jeremiah Donovan and Trooper Eric Benson.

At Ferreira's direction, Washington obtained the victim's call logs and began contacting phone numbers listed as incoming

and outgoing calls near the time of the shooting. One of the listed numbers, which was associated with the defendant's cell phone, appeared as an incoming call to the victim's cell phone at 12:50 P.M. on September 29, the day of the shooting. A return call was then made from the victim's cell phone to the defendant's associated cell phone at approximately 1:02 P.M., just over twenty minutes before the police were dispatched to the scene at 1:23 P.M.

Washington called the defendant's phone number on September 29, and identified himself as a Fall River police officer investigating the victim's murder. The individual who answered had a male voice and identified himself as "Brandyn Jackson." Washington asked "Jackson" to come into the station for questioning, but the male replied he could not do so because he was in New Bedford with his mother.

Washington called the defendant's number two more times on October 1, 2012. Once again, the individual who answered the call identified himself as Brandyn Jackson. "Jackson" further declined Washington's request to come into the station for questioning. That same day, the police received a tip from a first-time confidential informant, whose identity and contact information were known to the police. The informant indicated an individual known as "gay-boy Brandyn" was responsible for the victim's death. According to the informant, the victim's phone

records would show Brandyn had called the victim on September 29, at around 1 P.M., to arrange a drug transaction up the street from Brandyn's house. The informant further explained, when Brandyn and the victim met for the planned drug transaction and began to argue over drugs and money, Brandyn shot the victim. This account was consistent with drug evidence found at the scene of the robbery. It was further corroborated when Ferreira, the lead investigator, independently learned the victim was a street-level drug dealer and the victim's wife claimed the victim had issues or a conflict with "gay-boy Brandyn."

Unable to convince "Brandyn Jackson" to come to the station for questioning, Washington contacted the defendant's cellular service provider, T-Mobile, seeking the call detail records, CSLI, and ping data associated with the defendant's cell phone number. A senior member of T-Mobile's law enforcement relations group testified about T-Mobile's protocols regarding law enforcement requests for cell phone records under the voluntary disclosure provision of the SCA, 18 U.S.C. § 2702. The T-Mobile employee testified that a law enforcement agent seeking such records, who is facing an ostensible emergency, may call the company and explain the emergency circumstances warranting voluntary disclosure. After the law enforcement agent has done

so, the agent is sent a preprinted "[e]xigent [c]ircumstances [r]equest [f]orm" drafted by T-Mobile.

Among other information, this form asks for a description of the emergency and the phone number for which records are sought. Additionally, the requesting party can choose several records to be disclosed, including "[c]all [d]etail [r]ecords with [c]ell [s]ite [i]information (within the past 48 hours)" and "[r]eal-[t]ime location of [m]obile [d]evice [ping data]." After filling out this form and signing it under the pains and penalties of perjury, the requesting party must send it back to T-Mobile. The completed form is then reviewed by a member of T-Mobile's law enforcement group, and if it determines based on the content of the form that exigent circumstances exist, the company will comply with the request.

In this case, after calling T-Mobile, Washington filled out an exigent circumstances request form and sent it by facsimile to T-Mobile. On the form, he described the emergency as: "Homicide investigation and number (phone) was last contacted during murder. Unknown where owner is or if owner is alive or deceased." From the list of records that could be requested, Washington selected call detail records with CSLI and ping data.[8]

---

[8] Washington also selected "[c]urrent [s]ubscriber [i]nformation" and "[o]ther," but he did not list what other information he was seeking in the space provided.

T-Mobile determined an exigency existed and sent Washington the call detail records for the defendant's cell phone number, which consisted of a time-stamped log of all incoming and outgoing calls and text messages associated with his number from September 9, 2012, through October 1, 2012.[9],[10]  After receiving the call detail records, Washington began contacting the phone

---

[9] Though the call detail records included the times when text messages were sent or received, the records did not contain the content of any text messages.

[10] Because Washington requested CSLI, the call detail records also contained cell site identification numbers and location area codes.  The T-Mobile employee at the evidentiary hearing explained a cell site identification number "is the number assigned to [a] particular cell site in [a] sector, [while] the location area code may encompass a larger area . . . or it could encompass different equipment that's on the [cell] tower."  As we have previously explained, "[a] cellular service provider has a network of base stations, also referred to as cell sites or cell towers, that essentially divides the provider's service area into 'sectors.' . . .  Cell site antennae send and receive signals from subscribers' cellular telephones that are operating within a particular sector." Augustine, 467 Mass. at 237.

Notably, as the T-Mobile employee acknowledged during the evidentiary hearing, this CSLI "isn't really helpful to anybody" unless further information -- such as the corresponding addresses of the cell sites or their latitude and longitude -- are produced as well.  Although the employee confirmed such information can be provided by T-Mobile to law enforcement, the call detail records in this case do not include it, unlike in Augustine, 467 Mass. at 239, where the CSLI included "the latitude and longitude of the cell sites."  Nor is there any evidence in this case that the police otherwise accessed such information.  In other words, in the absence of further information, the police in this case would be unable to decipher the provided CSLI.

numbers listed therein, including numbers belonging to Jordan Ferreira,[11] Brabant, and Skomiro, who were each interviewed by the police.[12]

On the morning of October 2, the police interviewed Jordan. Jordan told the police he met with the defendant on September 28, the day before the victim's death, to buy marijuana at a location approximately one block away from where the victim's body was found. During this meeting, the defendant told Jordan: "I've got the heat, I ain't droppin' no shells." Jordan took this statement to mean the defendant had a gun, most likely a revolver. Jordan also told the police he was with the defendant near the scene of the shooting on the day of the murder.

Later that day, the police also interviewed Brabant. Brabant told the police the defendant had been living at his residence, which was approximately two hundred feet from the murder scene. According to Brabant, the defendant came to his residence on the morning of the shooting but then left between 11 A.M. and 11:30 A.M. to "make some plays," which Brabant understood to mean the defendant intended to sell drugs. The

---

[11] Because this witness shares the same last name as one of the police officers in this case, we refer to this witness by his first name for clarity.

[12] The police also contacted and interviewed Richard and the defendant's friend Jessica Rogers, who identified the defendant's phone number on his call detail records during an interview.

defendant returned to the residence later that morning to replenish his supply of marijuana. Brabant further told the police that, on his return, the defendant asked if Brabant could acquire any .38 caliber bullets; Brabant responded he could not. Also on October 2, the police interviewed Skomiro, who informed them he and the defendant were staying with Richard. Skomiro further informed the police that on the day of the murder, he picked up the defendant near the scene of the shooting and traveled with him to Richard's apartment.

Based on this information, Ferreira applied for a warrant to search Richard's apartment and sent officers to secure the scene, where the defendant was later arrested and taken into custody.

ii. <u>Motion judge's rulings of law</u>. "In reviewing the denial of a motion to suppress, we . . . assess the correctness of the judge's legal conclusions de novo" (citation omitted). <u>Henley</u>, 488 Mass. at 100. See <u>Commonwealth</u> v. <u>Gumkowski</u>, 487 Mass. 314, 317 (2021) ("we undertake an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found" [quotation and citation omitted]).

A. <u>Call detail records</u>. In denying the defendant's motions to suppress, the motion judge correctly concluded that, pursuant to <u>Commonwealth</u> v. <u>Augustine</u>, 467 Mass. 230, 251

(2014), S.C., 470 Mass. 837 and 472 Mass. 448 (2015), the defendant did not have a reasonable expectation of privacy in his call detail records, and therefore the police did not need a warrant to obtain this information.[13]

"The Fourth Amendment and art. 14 protect individuals from unreasonable searches and seizures." Commonwealth v. Almonor, 482 Mass. 35, 40 (2019). "For these constitutional protections to apply, however, the Commonwealth's conduct must constitute a search in the constitutional sense[,] . . . [which] occurs when the government[] . . . intrudes on a person's reasonable expectation of privacy" (quotation and citation omitted). Id. "An individual has a reasonable expectation of privacy if (i) the individual has manifested a subjective expectation of privacy in the object of the search, and (ii) if society is willing to recognize that expectation as reasonable" (quotations

---

[13] The motion judge also correctly concluded the defendant was not entitled to suppression of the records pursuant to the SCA. The SCA permits an aggrieved party to file a civil suit against the cellular provider, but expressly states the remedies described therein "are the only judicial remedies . . . for nonconstitutional violations of [the SCA]." 18 U.S.C. § 2708. See 18 U.S.C. § 2707 (civil suits). Because we conclude the search of these records was constitutionally permissible, suppression would not be appropriate, regardless of whether the search violated the SCA. See United States v. Guerrero, 768 F.3d 351, 358 (5th Cir. 2014), cert. denied, 575 U.S. 916 (2015) ("suppression is not a remedy for a [nonconstitutional] violation of the [SCA]").

and citation omitted).  Id.  See Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

Pursuant to the third-party doctrine, individuals have historically lacked a legitimate expectation of privacy in information that they voluntarily convey to third parties and is collected for legitimate business purposes.  See Smith v. Maryland, 442 U.S. 735, 743-744 (1979); Commonwealth v. Cote, 407 Mass. 827, 834 (1990).  However, with the rise of the "digital age, [in which] the technology of real-time monitoring has become commonplace," we have narrowed the application of this doctrine.  Henley, 488 Mass. at 107-108.  In Augustine, 467 Mass. at 249-252, we concluded CSLI is not covered by the third-party doctrine because individuals do not voluntarily convey their location information to cellular service providers in the same manner they convey the phone numbers they dial.  Rather, "CSLI is purely a function and product of [cell phone] technology, created by the provider's system network at the time that a [cell phone] call connects to a cell site[,] . . . a serendipitous (but welcome) gift to law enforcement investigations."  Id. at 250-251.  See Henley, supra (declining to extend third-party doctrine to location information obtained by Massachusetts Bay Transportation Authority from transactions using stored-value transit fare card).

Despite the narrowing of the third-party doctrine in other contexts, it remains applicable to call detail records. Notwithstanding recent technological changes, the phone numbers an individual dials are still conveyed voluntarily to a phone service provider, and providers still maintain those records for legitimate business purposes. See Augustine, 467 Mass. at 251 ("we see no reason to change our view that the third-party doctrine applies to traditional telephone records"). See also Smith, 442 U.S. at 744 (no reasonable expectation of privacy in telephone numbers dialed); Cote, 407 Mass. at 834 (no reasonable expectation of privacy in telephone answering service because it "necessarily involved a voluntary conveyance of information to [a] third party").

The defendant asks us to revisit our art. 14 jurisprudence and hold that, because the SCA limits the circumstances in which a third-party provider of electronic communication services can disclose call detail records, the SCA creates a reasonable expectation of privacy in this information. He does not cite to any Massachusetts authorities for this proposition.[14] In the

---

[14] The defendant asks us to adopt the reasoning of the Supreme Court of Iowa in State v. Wright, 961 N.W.2d 396 (Iowa 2021), in which the court held citizens have a reasonable expectation of privacy in closed garbage bags left out for collection, due in part to a local ordinance restricting the parties authorized to collect such bags. Id. at 419. However, this court already held in Commonwealth v. Pratt, 407 Mass. 647, 660 (1990), that a defendant lacked a reasonable expectation of

absence of any compelling reason to depart from our jurisprudence in this area, we conclude the SCA does not create a reasonable expectation of privacy in call detail records for purposes of the Fourth Amendment or art. 14.  Though the SCA limits the circumstances in which providers of electronic communication services may disclose call detail records, a person still assumes the risk "that the information will be conveyed by [the service provider] to the Government" when he or she volunteers this information to the provider.  Cote, 407 Mass. at 834, quoting United States v. Miller, 425 U.S. 435, 443 (1976).

B.  CSLI.  While the motion judge focused on the defendant's call detail records in her decision, the motion judge noted the defendant's CSLI was not used in any warrant applications and the Commonwealth did not intend to introduce it as evidence at trial; therefore, the motion judge explicitly limited her decision to the call detail records.  Assuming, without deciding, that the motion judge erred in failing to order the suppression of the CSLI, we review such error to

---

privacy in trash bags he had placed at the curb for collection. Although the ordinance in that case similarly "allowed only licensed trash collectors to transport garbage," we concluded this fact "[did] not make the defendant's subjective expectation of privacy any more reasonable" as "[t]he licensed collectors may have rummaged through the defendant's garbage themselves." Id.

determine whether it was harmless beyond a reasonable doubt.
See Gumkowski, 487 Mass. at 321-322 (applying harmless error
standard to erroneous admission of CSLI at trial). When
evaluating if an error is harmless, we must decide whether "on
the totality of the record before us, weighing the properly
admitted and the improperly admitted evidence together, . . . we
are satisfied beyond a reasonable doubt that the tainted
evidence did not have an effect on the jury and did not
contribute to the jury's verdicts" (citation omitted). Id. at
322.

Here, even assuming the police unlawfully obtained the
CSLI, the police did not use this information to secure evidence
against the defendant, as we explain infra.[15] Given that no
fruits -- tainted or otherwise -- were derived from the CSLI,
let alone admitted in evidence, the error was harmless beyond a
reasonable doubt. See Commonwealth v. Tavares, 482 Mass. 694,

---

[15] Additionally, although the call detail records containing
the CSLI were introduced at trial, no evidence was admitted at
trial that would allow the jury to decipher the CSLI --
comprised of a series of numbers and codes -- in any meaningful
sense. See note 10, supra. Therefore, this CSLI could not have
had any effect on the jury's verdicts.

715 (2019) (defendant failed to identify any specific evidence admitted at trial derived from suppressed recordings).[16],[17]

b. <u>Motion for a new trial</u>. On appeal from the denial of his motion for a new trial, the defendant similarly argues the police violated his rights under the Fourth Amendment and art. 14 by obtaining his historical CSLI and ping data without a warrant.[18]

Unique to his motion for a new trial, the defendant further argues the Commonwealth violated his due process rights under

---

[16] Where no decipherable CSLI was admitted at trial, and where the defendant's CSLI was not used by the police to further their investigation or develop evidence against the defendant, "[w]e do not need to analyze whether there was probable cause and exigency" to obtain this information. <u>Commonwealth</u> v. <u>Lugo</u>, 482 Mass. 94, 109 (2019). See <u>Commonwealth</u> v. <u>Chesko</u>, 486 Mass. 314, 322 n.9 (2020) ("we need not determine whether, as the defendant argues, the Commonwealth's application for the CSLI failed to meet . . . the probable cause standard set forth in [<u>Augustine</u>, 467 Mass. at 255]").

[17] In his motions to suppress, the defendant did not seek to suppress the ping data. Regardless, any error would have likewise been harmless beyond a reasonable doubt. The ping data was not introduced at trial and, as discussed <u>infra</u>, also not utilized by the police during their investigation. See <u>Gumkowski</u>, 487 Mass. at 320, 322.

[18] Moreover, the defendant also reiterates his argument from his motions to suppress that his call detail records were unlawfully obtained because Washington lied in the exigent circumstances request form he submitted to T-Mobile. The motion judge found Washington did not lie on the form or "act in bad faith" when he sent the form to T-Mobile. Although our discussion <u>supra</u> obviates any need to further discuss this issue, it suffices to say the judge's finding that Washington did not lie is supported by substantial evidence.

the Fifth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights by allegedly concealing from the defendant the fact the police used his cell phone's location data during their investigation.  Specifically, the defendant asserts the police used information they acquired from his CSLI and ping data to elicit statements from witnesses that incriminated the defendant, which in turn were used to secure the search warrants leading to the seizure of incriminating physical evidence against him, including the murder weapon, bloodstained clothing, and contraband.  The defendant also alleges the police used ping data to track him during their investigation, which led to his arrest and the seizure of his cell phone.  The defendant further claims that, after using his CSLI and ping data in this manner, the police and the prosecutor then engaged in a conspiracy to hide their actions from the defendant and the court.  Lastly, the defendant argues his trial counsel was ineffective for failing to discover the police used his CSLI and ping data during the investigation.

    i.  Motion judge's factual findings.  "In reviewing a motion judge's findings of fact made after an evidentiary hearing [on a motion for a new trial], we accept the findings where they are supported by substantial evidence in the record. . . .  When, as here, the motion judge did not preside

at trial, we defer to that judge's assessment of the credibility of witnesses at the hearing on the new trial motion, but regard ourselves in as good a position as the motion judge to assess the trial record" (quotation and citation omitted). Commonwealth v. Velez, 487 Mass. 533, 540-541 (2021). Since the defendant raised similar arguments in his motion for a new trial to those pressed in his motions to suppress, many of the motion judge's factual findings in her order on the motion for a new trial overlap with those in her order on the motions to suppress. To avoid duplication, we limit this summary to any factual findings discrete to the discussion infra.

In the absence of any notable evidence suggesting otherwise, the motion judge found the CSLI and ping data that T-Mobile sent to Washington was not used by the police during their investigation to develop witness testimony or to track the defendant prior to his arrest.[19] At most, the motion judge found the CSLI and ping data were received, but not used by, the

---

[19] The motion judge also found the police did not intentionally conceal from the defendant that they requested and received the CSLI or ping data, because the exigent circumstances request form, among other records, was produced to defense counsel by the Commonwealth. Further, the motion judge also found the police lacked a motive to hide their request for and receipt of this information, noting Augustine, 467 Mass. at 251, had not been decided at the time the officers obtained the defendant's records. These findings are supported by substantial evidence.

police.  Specifically, T-Mobile sent Washington sixty-two hours of CSLI for the defendant's cell phone, which Washington forwarded to Donovan.  Washington also received ping data from T-Mobile, though this information "was never located or produced in court."[20]  Although Washington believed he sent the ping data to Donovan as well, Donovan confirmed "he never received the ping data and did not know how it was used."[21]

Regarding the defendant's arrest and his assertion that the police used ping data to locate him, the motion judge found the defendant was apprehended in the parking lot of Richard's apartment complex on October 2.  Instead of using ping data to locate the defendant, the motion judge found the police learned the defendant was staying at Richard's apartment from witness interviews.  The judge further credited testimony from Camara that he and another officer were conducting surveillance at Richard's apartment building that evening, while awaiting the

---

[20] The motion judge noted:  "The record is unclear as to when the ping data was sent by T-Mobile, the form in which it was sent (either by e[-]mail or phone) or what was done with the ping data after it was received."  However, because an e-mail message Washington forwarded to Donovan only contained call detail records and CSLI, the motion judge inferred T-Mobile must have "shared the ping [data] by phone or fax, but not by e[-]mail."

[21] The motion judge found the police officers' inability at times to "recall the minutia of their investigation conducted nine years earlier" during the evidentiary hearing was "a result of the passage of time and not an attempt to mislead the court."

issuance of a search warrant, when they observed the defendant approach in a vehicle and took him into custody. Bearing in mind these findings depended on the motion judge's credibility determinations, we conclude they are supported by substantial evidence.

Camara testified he did not request or use ping data to locate the defendant while surveilling Richard's apartment, had no knowledge of anyone possessing such data, and did not recall ever learning of any CSLI. Further, Camara testified that, while surveilling Richard's apartment building, he became suspicious of a car, in which he eventually discovered the defendant, because it sat idle in the apartment parking lot with its running lights on for about ten minutes. Eventually, the car left its parking spot and headed in Camara's direction, at which point he noticed the car was the same make and model as the car in which the defendant had last been seen. The officers then proceeded to stop the car and discovered the defendant in the passenger seat. In short, Camara's testimony clearly lays out how he and other officers located the defendant without the use of the defendant's cell phone information.

The defendant nonetheless maintains the motion judge erred in finding the police did not use the CSLI or ping data. In support of this assertion, he focuses on three specific parts of the record before the motion judge.

First, the defendant points to the interview of Brabant, during which the questioning officer, Benson, inquired about a series of phone calls between Brabant and the defendant on the day of the murder. After Brabant claimed he was unable to remember what was discussed, Benson told Brabant: "It might blow you down if I laid this out to you, but I can tell you that basically during all of those calls, he is outside your house. We know he is right outside your house. . . . He is right there. And he is there for hours." The motion judge rejected the defendant's theory that Benson must have used the CSLI to determine the defendant's location from the defendant's calls with Brabant. Instead, the motion judge credited Benson's testimony that he was merely embellishing the police's knowledge of the defendant's whereabouts.

As the motion judge explained: "CSLI data would have provided the police only with the tower to which the cell phone connected, not the exact location of the phone, leaving an area of one-half to three miles of ground as to where the phone might have been located, not a location as specific as right outside [Brabant's] house." Additionally, the motion judge credited Benson's testimony that the police learned the defendant was in the general area of Brabant's residence prior to Brabant's calls

with the defendant through previous witness interviews."[22]  This testimony supports the judge's finding that Benson was not relying on the CSLI, but rather "embellish[ing]" the police's knowledge derived from other sources.

Next, the defendant points to another statement in the same interview with Brabant where Benson claimed to know the defendant turned off his phone the evening of October 1.  The defendant maintains the police must have used the ping data for his cell phone around that time; otherwise, he claims, they would not have known his phone was off.  However, the motion judge again "credit[ed] Benson's testimony that he did not rely upon ping data . . . but must have learned that the defendant's phone was off [through] other means, such as by calling the defendant's phone and it going directly to voicemail."

---

[22] Specifically, Benson testified:  "I know that at the time that I made this statement, we had spoken to Jordan Ferrier, a witness from the previous day.  He had indicated that he had made a call or that he had purchased marijuana from Mr. Lepage at the intersection [where] Mr. Brabant's house . . . sits." Benson later testified that, based on Jordan's interview, the police knew the defendant was "outside selling marijuana sometime after 11:40 [$\underline{A}$.$\underline{M}$.]," and the defendant had "a history of selling [marijuana] in that area."  Additionally, Benson testified that he believed another witness, Jessica Rogers, had also indicated the defendant was living at Brabant's residence, which further supported the notion the defendant was in the area.

During the evidentiary hearing on the motion for a new trial, the following exchange occurred between Benson and defense counsel:

Q.: "[Washington] got prospective cell site location information; what's sometimes referred to as ping information, correct?"

A.: "Yes.  I have come to find that out, yes."

. . .

Q.: "[D]id you ever learn of the use of this ping information during the investigation?"

A.: "No."

Q.: "Okay.  So as you're sitting here today, you have no knowledge of how that ping information was used?"

A.: "No."

The defendant's theory, that Benson knew the defendant's phone was turned off because of the ping data, is squarely contradicted by Benson's own credited testimony that he had no knowledge of how the ping data was used during the investigation.

Third, the defendant points to the statement of another officer, McDonald, who interviewed the defendant's romantic partner, Skomiro.  During this interview on October 2, McDonald conveyed to Skomiro that the defendant had been driving around with another romantic interest, Alex Vieira, over the previous twenty-four hours in New Bedford.  The defendant argues this shows the police used his CSLI or ping data to determine the

defendant's location at that time. However, the motion judge "credit[ed] McDonald's testimony that he did not receive any CSLI or ping [data] during the investigation" and instead acquired knowledge of the defendant's whereabouts "based upon witness interviews and . . . physical surveillance of the defendant."

Evidence was presented that the caller who had identified himself as "Brandyn Jackson" -- who the police suspected was the defendant -- had already told Washington he was in New Bedford. Further, two witnesses -- the defendant's "best friend," Jessica Rogers, and Brabant -- told the police they had seen the defendant and Vieira together on September 29 and October 1, respectively. Finally, as explained by the motion judge, "pinging the defendant's phone would only have provided the police with the defendant's whereabouts, not whether he was with someone else, or the identity of this individual."

In sum, there is substantial evidence in the record to support the motion judge's finding that law enforcement personnel did not use the CSLI or ping data as part of their investigation of the defendant and his eventual apprehension.

ii. Motion judge's rulings of law. As noted supra, "[w]here an appeal from the denial of a motion for a new trial has been consolidated with a defendant's direct appeal from a conviction of murder in the first degree, we review the denial

of the motion for a new trial under G. L. c. 278, § 33E."
Commonwealth v. Duke, 489 Mass. 649, 662 (2022).  "Thus, we
examine the motion judge's decision to determine whether there
was error and, if so, whether the error created a substantial
likelihood of a miscarriage of justice."  Id.

A.  Due process.  The defendant continues to maintain on
appeal that the Commonwealth violated his constitutional rights
to due process by intentionally concealing from him the fact the
police obtained and used his cell phone's historical CSLI and
real-time ping data both to develop witness testimony against
him, and to track and arrest him.  "Under the due process clause
of the Fourteenth Amendment to the United States Constitution
and art. 12 of the Massachusetts Declaration of Rights, a
prosecutor must disclose exculpatory information to a defendant
that is material to either guilt or punishment" (citation
omitted).  Commonwealth v. Pope, 489 Mass. 790, 797 (2022).  See
Brady v. Maryland, 373 U.S. 83, 87 (1963).  A defendant may be
entitled to a new trial where the government fails to comply
with the obligation to turn over exculpatory evidence.  Pope,
supra at 798.  "To obtain a new trial on the basis of
nondisclosed exculpatory evidence, a defendant must establish
(1) that the evidence was in the possession, custody, or control
of the prosecutor or a person subject to the prosecutor's
control; (2) that the evidence is exculpatory; and (3)

prejudice" (quotations, citation, and alteration omitted).
Commonwealth v. Sullivan, 478 Mass. 369, 380 (2017).

Here, the motion judge concluded the defendant failed to establish any exculpatory evidence existed.[23]  See Commonwealth v. Schand, 420 Mass. 783, 787 (1995) (to prevail, defendant was obligated to "establish that the [exculpatory] evidence existed").  As outlined supra, after crediting the testimony of the interviewing and arresting officers, the motion judge found, based on their testimony, that the police did not use the CSLI or ping data during their investigation to obtain information from the witnesses they interviewed, to track and arrest the defendant, or to otherwise develop the evidence against the defendant.  Accordingly, the motion judge reasoned, because the Commonwealth did not use this data, "the Commonwealth had nothing to disclose."  On these facts, we agree with the motion judge that the Commonwealth did not violate the defendant's due process rights by failing to disclose the alleged misuse of the location data.  Accordingly, the motion judge did not err in denying the defendant's motion for a new trial based on his claim the Commonwealth withheld exculpatory evidence.

---

[23] As a threshold matter, the defendant cannot reasonably claim any records obtained from T-Mobile were withheld from him considering he received the exigent circumstances request form in discovery, which should have alerted him to the fact the police had, at minimum, requested the information.

B.  Ineffective assistance of counsel.  The defendant next claims he was entitled to a new trial because his trial counsel was ineffective in failing to investigate how the police misused the defendant's historical CSLI and ping data.

> "Because the defendant was convicted of murder in the first degree, we do not evaluate his ineffective assistance claim under the traditional standard set forth in Commonwealth v. Saferian, 366 Mass. 89, 96, (1974).  Instead, we apply the more favorable standard of G. L. c. 278, § 33E, and review his claim to determine whether there was a substantial likelihood of a miscarriage of justice.  Under this review, we first ask whether defense counsel committed an error in the course of the trial."  (Citations and footnote omitted.)

Commonwealth v. Ayala, 481 Mass. 46, 62 (2018).  "If there was an error, we ask whether it was likely to have influenced the jury's conclusion."  Id.

Here, the defendant did not demonstrate his trial counsel committed any error.  As the motion judge concluded, the defendant has not "show[n] that further investigation of the police's alleged use of CSLI and ping data would have accomplished something material for the defense" given that "the police did not use the defendant's CSLI or ping data to secure evidence in the investigation."  Indeed, the notion trial counsel would have discovered the police did in fact use this data is entirely speculative.  See Commonwealth v. Watson, 455 Mass. 246, 256 (2009) ("mere speculation, without more, is insufficient to establish ineffective representation").

Therefore, the motion judge did not err in denying the defendant's motion for a new trial based on his claim of ineffective assistance of counsel.

c. <u>Review under G. L. c. 278, § 33E</u>. Having reviewed the entire record, we discern no reason to exercise our extraordinary authority under G. L. c. 278, § 33E.

3. <u>Conclusion</u>. The defendant's conviction of murder in the first degree and the order denying his motion for a new trial are affirmed. We vacate the defendant's conviction of unlawful possession of a firearm and remand for a new trial on that indictment.[24]

<u>So ordered</u>.

---

[24] See note 5, <u>supra</u>.